AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Meta Platforms Account Information<br>Associated with Fernando Enriquez | )<br>)<br>) Case No.  22 - 3073MB<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, incorporated by reference

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before     4-15-22
                                                                                                         *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.          ☐ at any time in the day or night as I find reasonable cause has been
                                                                          established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
on duty in the District of Arizona                             .
                          *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
                                                        ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   4-1-22 @ 11:49 A.M.          M Morrissey
                                                                                      *Judge's signature*

City and state:    Phoenix Arizona                          Michael T. Morrissey, U.S. Magistrate Judge
                                                                                      *Printed name and title*

*AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|

| Certification |
|---|

> I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

**Meta Platforms Inc.**

**(Facebook & Instagram)**

**Property to Be Searched**

This warrant applies to records and information, to include location information, that is stored at premises owned, maintained, controlled, or operated by Meta Platforms Inc., 1601 Willow Road, Menlo Park, CA 94025. In particular, the Facebook and Instagram accounts associated with the following account identifiers and user IDs, between the specified dates. Specifically:

From June 1, 2021 to the date of this warrant for accounts:

- Facebook UserID: 100001838959818
- Instagram account: @enriquezf3000 (which was viewed on March 16, 2022, at URL www.instagram.com/enriquezf3000/)

**ATTACHMENT B**

**Meta Platforms Inc.**

**(Facebook & Instagram)**

**Particular Things to be Seized**

I.      **Information to be disclosed by Meta Platforms, Inc. (Facebook & Instagram)**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc. ("Meta Platforms"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta Platforms, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta Platforms is required to disclose the following information to the government for each user ID or account listed in Attachment A, for the period of time specified in Attachment A to the date of this warrant:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook / Instagram activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook / Instagram user identification numbers; groups and networks of which the user is a member, including the groups'

Facebook / Instagram group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook / Instagram applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All GPS information or other location information;

(i)     All IP logs, including all records of the IP addresses that logged into the account;

(j)     All records of the account's usage of the "Like" feature, including all Facebook / Instagram posts and all non-Facebook / non-Instagram webpages and content that the user has "liked";

(k)     All information about the Facebook/ Instagram pages that the account is or was a "fan" of;

(l)     All past and present lists of friends created by the account;

(m)     All records of Facebook / Instagram searches performed by the account from;

(n)     All information about the user's access and use of Facebook / Instagram Marketplace;

(o)     The types of service utilized by the user;

(p)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(q)    All privacy settings and other account settings, including privacy settings for individual Facebook / Instagram posts and activities, and all records showing which Facebook users have been blocked by the account; and

(r)    All records pertaining to communications between Facebook / Instagram and any person regarding the user or the user's Facebook / Instagram account, including contacts with support services and records of actions taken.

(s)    All video and voice recorded chat messages and MP4 audio or video clips.

Meta Platforms is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations 18 U.S.C. § 2113(a) and (d) (Bank Robbery and Incidental Crimes) and 18 U.S.C. § 924(c) (Brandishing, Displaying, or Discharging a Firearm During a Crime of Violence), including, for each account identified on Attachment A, information pertaining to the following matters:

(a)    The subject(s)'s engagement in bank robbery or incidental crimes.

(b)    Possession, use or ownership of a firearm and/or ammunition.

(c)    Clothing or tools, methods, or instruments used to facilitate robberies as depicted in surveillance images and/or described by witnesses.

(d)    Communications, messages, conversations, photos, videos, locations, maps, routes, schedules, calendars, travel information or other information related to the planning of or the execution of bank robberies, or the use, possession, acquisition or disposition of a firearm and/or ammunition.

(e)  Documents, images, communications or other items bearing the name of or identifying the victim business institutions.

(f)  Photographs, videos, or other digital content depicting the identified subjects and/or their associates with property obtained or derived from the robberies, or with the tools or instrumentalities used in the commission of the robberies, or preparations and planning for the execution of the robberies.

(g)  Maps, routes, pictures, videos or photographs of or related to the offense locations, or travel related to the criminal activity.

(h)  Records indicating indicia of rental, ownership, or use of any vehicles.

(i)  Notes, documents, or communications containing names and contact information of associates of Fernando Enriquez and/or Crystal Quispe.

(j)  Records relating to who created, used, or communicated with the User ID, including records about their identities and whereabouts.

(k)  Location information, to include GPS information.

(l)  Evidence indicating how and when the Facebook / Instagram account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook / Instagram account owner;

(m)  Evidence indicating the Facebook / Instagram account owner's state of mind as it relates to the crime under investigation; and

(n)  The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents,

attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the
### District of Arizona

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  22 - 3073MB |
| Meta Platforms Account Information | ) | |
| Associated with Fernando Enriquez | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, incorporated by reference.

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B, incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18 U.S.C. 2113(a) and (d) | Armed Bank Robbery |
| Title 18 U.S.C. 924(c) | Brandishing, Displaying, or Discharging a Firearm During a Crime of Violence |

The application is based on these facts:
See attached Affidavit, incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____*Brett Day*_____
Reviewed by Brett A. Day, AUSA

TRAVIS BODILY  Digitally signed by TRAVIS BODILY
Date: 2022.03.31 16:20:16 -07'00'
_____
*Applicant's signature*

Travis K. Bodily, Special Agent, FBI
*Printed name and title*

Sworn to and signed electronically.

Date: __4-1-22 @ 11:49 A.M.__

City and state:  Phoenix, Arizona

_____*M Morrissey*_____
*Judge's signature*

Michael T. Morrissey, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

**Meta Platforms Inc.**

**(Facebook & Instagram)**

**Property to Be Searched**

This warrant applies to records and information, to include location information, that is stored at premises owned, maintained, controlled, or operated by Meta Platforms Inc., 1601 Willow Road, Menlo Park, CA 94025.  In particular, the Facebook and Instagram accounts associated with the following account identifiers and user IDs, between the specified dates.  Specifically:

From June 1, 2021 to the date of this warrant for accounts:

- Facebook UserID: 100001838959818
- Instagram account: @enriquezf3000 (which was viewed on March 16, 2022, at URL www.instagram.com/enriquezf3000/)

**ATTACHMENT B**

**Meta Platforms Inc.**

**(Facebook & Instagram)**

**Particular Things to be Seized**

**I.    Information to be disclosed by Meta Platforms, Inc. (Facebook & Instagram)**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc. ("Meta Platforms"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta Platforms, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta Platforms is required to disclose the following information to the government for each user ID or account listed in Attachment A, for the period of time specified in Attachment A to the date of this warrant:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook / Instagram activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook / Instagram user identification numbers; groups and networks of which the user is a member, including the groups'

Facebook / Instagram group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook / Instagram applications;

(e)   All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)   All other records and contents of communications and messages made or received by the user from, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)   All "check ins" and other location information;

(h)   All GPS information or other location information;

(i)   All IP logs, including all records of the IP addresses that logged into the account;

(j)   All records of the account's usage of the "Like" feature, including all Facebook / Instagram posts and all non-Facebook / non-Instagram webpages and content that the user has "liked";

(k)   All information about the Facebook/ Instagram pages that the account is or was a "fan" of;

(l)   All past and present lists of friends created by the account;

(m)   All records of Facebook / Instagram searches performed by the account from;

(n)   All information about the user's access and use of Facebook / Instagram Marketplace;

(o)   The types of service utilized by the user;

(p)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(q)     All privacy settings and other account settings, including privacy settings for individual Facebook / Instagram posts and activities, and all records showing which Facebook users have been blocked by the account; and

(r)     All records pertaining to communications between Facebook / Instagram and any person regarding the user or the user's Facebook / Instagram account, including contacts with support services and records of actions taken.

(s)     All video and voice recorded chat messages and MP4 audio or video clips.

Meta Platforms is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations 18 U.S.C. § 2113(a) and (d) (Bank Robbery and Incidental Crimes) and 18 U.S.C. § 924(c) (Brandishing, Displaying, or Discharging a Firearm During a Crime of Violence), including, for each account identified on Attachment A, information pertaining to the following matters:

(a)     The subject(s)'s engagement in bank robbery or incidental crimes.

(b)     Possession, use or ownership of a firearm and/or ammunition.

(c)     Clothing or tools, methods, or instruments used to facilitate robberies as depicted in surveillance images and/or described by witnesses.

(d)     Communications, messages, conversations, photos, videos, locations, maps, routes, schedules, calendars, travel information or other information related to the planning of or the execution of bank robberies, or the use, possession, acquisition or disposition of a firearm and/or ammunition.

(e)   Documents, images, communications or other items bearing the name of or identifying the victim business institutions.

(f)   Photographs, videos, or other digital content depicting the identified subjects and/or their associates with property obtained or derived from the robberies, or with the tools or instrumentalities used in the commission of the robberies, or preparations and planning for the execution of the robberies.

(g)   Maps, routes, pictures, videos or photographs of or related to the offense locations, or travel related to the criminal activity.

(h)   Records indicating indicia of rental, ownership, or use of any vehicles.

(i)   Notes, documents, or communications containing names and contact information of associates of Fernando Enriquez and/or Crystal Quispe.

(j)   Records relating to who created, used, or communicated with the User ID, including records about their identities and whereabouts.

(k)   Location information, to include GPS information.

(l)   Evidence indicating how and when the Facebook / Instagram account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook / Instagram account owner;

(m)  Evidence indicating the Facebook / Instagram account owner's state of mind as it relates to the crime under investigation; and

(n)   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents,

attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Travis K. Bodily, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of an application for search warrants for records and information associated with the listed accounts that are stored at premises owned, maintained, controlled, or operated by the listed cellular telephone service providers, electronic communication service providers, and/or the remote computing service providers ("**Providers**").   The information to be searched is described in the following paragraphs and in Attachment A.   This Affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require the **Providers** to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the identified accounts and user IDs.  This search warrant request pertains to the following **Providers**:

2.      AT&T, a cellular telephone service provider. Specifically, information associated with cellular telephones: (480)544-9901 ("**Target Cellphone-1**").    and (480)432-6094 ("**Target Cellphone-2**").

3.      Meta Platforms Inc., a social networking company headquartered at 1601 Willow Road, Menlo Park, California. Instagram and Facebook are services owned by and offered by Meta Platforms Inc.  Specifically, for Facebook and Instagram accounts:

- Facebook UserID: 100001838959818
- Instagram account: @enriquezf3000 (was viewed on March 16, 2022 at URL www.instagram.com/enriquezf3000/)

4.      Google LLC, a remote computing service provider, which is located at 1600 Amphitheatre Parkway, Mountain View, California.  Specifically, for Google accounts associated with account identifiers:

- Email addresses:
    - enriquezf3000@gmail.com
    - enriquezfernando@yahoo.com
    - diazcrystal1988@gmail.com

- Cellular phone numbers
    - +1(480)544-9901
    - +1(602)341-2240
    - +1(480)432-6094
- IMEI #
    - 351721113883348
    - 355565110623710

5.      TikTok Inc., a social networking company, whose United States office is located at 5800 Bristol Parkway, Suite 100, Culver City, CA. Specifically, accounts associated with:

- TikTok username:
    - @elmexicano005
    - @diazcrystal88
- Email address:
    - enriquezf3000@gmail.com
    - diazcrystal1988@gmail.com
- Telephone number:

  o  +1(480)544-9901

6.   Yahoo Inc., a networking and remote computing service provider who receives legal process at 22000 AOL Way, Dulles, VA. Specifically, for Yahoo accounts identified by:

- enriquezfernando@yahoo.com

7.   I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been appointed as a Special Agent since June 2010. I am assigned to the FBI Violent Crime Task Force and have been since 2017. My duties include the investigation of crimes such as those at issue in this matter. Prior to investigating violent crimes, I investigated counterintelligence and counterproliferation matters for the FBI.

8.   The facts in this Affidavit come from my own investigation; my training and experience; information obtained from the knowledge, observations and investigation of other agents and law enforcement officers, either directly or indirectly through their reports or affidavits; review of law enforcement and public information databases; the acquisition and review of surveillance footage; and information obtained from witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.   Based on the facts set forth in this Affidavit, my training and experience, and in consultation with other experienced investigators, there is probable cause to believe that violations of 18 U.S.C. § 2113(a) and (d) (Bank Robbery and Incidental Crimes) and 18 U.S.C. § 924(c) (Brandishing, Displaying, or Discharging a Firearm During a Crime of Violence) have been committed by the users of the identified accounts. There is probable cause to search information in the accounts described in Attachment A for evidence of these crimes, as described in Attachment B. Accordingly, this application requests

authority to search the requested records, as the requested records and information are material to the investigation of a bank robbery series and criminal activities of the individuals utilizing the identified target accounts and target cell phones.

## PROBABLE CAUSE

10.    The FBI, along with other law enforcement agencies, have been investigating a series of armed bank robberies, in violation of 18 U.S.C. § 2113 and 18 U.S.C. § 924(c); which have occurred in multiple States, to include Arizona, Texas, New Mexico, California, and Mississippi, between on or about June 28, 2021 and March 29, 2022. Based on the physical description of the suspect and the modus operandi (M.O.) used during the robberies, investigators believe this series of bank robberies has been committed by the same suspect. On March 29, 2022, the suspect, Fernando Enriquez, was arrested following an armed bank robbery in Abilene, Texas.

11.    All United States currency stolen during these robberies was federally insured by either the Federal Deposit Insurance Corporation ("FDIC") or the National Credit Union Administration ("NCUA").

12.    Bank Robbery #1:  On June 28, 2021, at approximately 1003 hours, an unidentified male suspect entered the Wells Fargo Bank, a federally insured institution, located at 5625 FM 1960 Road West, Houston, Texas and committed a bank robbery. The suspect approached the teller counter and demanded money from the bank employee. The victim teller waited a moment expecting the suspect to produce a debit card. The suspect then told the victim teller to give him all the money in the drawer and told the teller not to push anything. According to the victim teller, the suspect lifted his shirt up and insinuated that he was armed. The victim teller, realizing it was a robbery, complied by providing the suspect with approximately $937.00 in U.S. currency.

13.    The suspect was described by witnesses, and a suspect fitting the description was observed on the bank's surveillance video at the time of the robbery. The suspect was described as: a Hispanic male; 27 to 30 years of age; approximately 5'8" tall; heavy build; wearing a black shirt; black medical style mask; black pants; black hat with the New York Yankees logo on the front; and black shoes. Photograph A is a still photograph taken from the bank's surveillance video.



Photograph A

14.    <u>Bank Robbery #2</u>:  On July 1, 2021, at approximately 0935 hours, an unidentified male suspect committed a bank robbery at the Wells Fargo Bank, a federally insured institution, located at 200 Lomas Boulevard NW, Albuquerque, New Mexico. The suspect entered the bank at approximately 0930 hours and waited in the customer queue line for the teller to finish serving another customer. The suspect then approached the teller counter and made a demand for money by saying something to the effect of, "give me all your money" while displaying a handgun in his waistband by lifting it part way out of his pants. The suspect said, "give me all your hundreds in the top drawer." The teller complied and gave the suspect approximately $1,078.00 in U.S. currency. The suspect took the money and left the bank. The suspect drove away in a vehicle described as a black-colored, Chevrolet sedan, with tinted windows and an Arizona license plate.

15.     The suspect was described by witnesses, and a suspect fitting the description was observed on the bank's surveillance video at the time of the robbery. The suspect was described as a Hispanic male in his thirties; heavy set; approximately 5'10" tall; wearing a dark-colored ball cap with what appeared to be a New York Yankees logo on the front; dark-colored shirt; a dark colored mask; and dark-colored pants.   Photographs B and C are still photographs taken from the bank's surveillance video.

 

Photograph B                     Photograph C

16.     <u>Bank Robbery #3</u>: On July 8, 2021, at approximately 1026 hours, an unidentified male suspect committed a bank robbery at the Chase Bank, a federally insured institution, located at 5305 South Superstition Mountain Drive, Gold Canyon, Arizona. The suspect entered the bank and walked over to the teller at which point he pulled out a handgun, held it in his hand, and displayed it to the victim teller.  The suspect made a verbal robbery demand to the victim, "give me all the money; don't push the button; hurry." The teller saw the handgun, realized it was a robbery and complied, giving the suspect approximately $2,835.00 in U.S. currency.  The suspect fled on foot to the south of the bank.

17.    The suspect was described by witnesses, and a suspect fitting the description was observed on the bank's surveillance video at the time of the robbery. The suspect was described as a Hispanic male; approximately 5'08" or 5'09" tall; weighing 200 lbs.; 30 to 35 years of age; wearing a black hooded sweatshirt with State of California bear logo on the front; black medical style mask on face; dark blue baseball cap with the New York Yankees logo; dark pants; and armed with a silver and black semi-automatic handgun. Review of bank surveillance video revealed the suspect had what appeared to be a dark mark or tattoo on the right side of his neck below and just behind the ear. Photographs D and E are still photographs taken from the bank's surveillance video.



Photograph D          Photograph E

18.    <u>Bank Robbery #4</u>:  On July 29, 2021, at approximately 1043 hours, an unidentified male suspect committed bank robbery at the Chase Bank, a federally insured institution, located at 5305 South Superstition Mountain Drive, Gold Canyon, Arizona. The suspect entered the bank and approached the victim teller. The victim teller recognized the suspect as the man who had robbed the bank a few weeks prior. The suspect verbally demanded all the victim teller's money and pointed a grey and black handgun at the teller. The suspect demanded more money than the last time, which the victim teller took as a reference to the prior robbery.  The victim teller realized it was a robbery and complied,

providing the suspect with approximately $6,706.00 in U.S. currency. The suspect took the money and fled the bank. The suspect was seen exiting the bank and walking through the parking lot toward a vehicle. The vehicle was described as a newer model, black colored, Chevrolet sedan, possibly a Chevy Cruze or similar style. It appeared the license plate had been removed. The suspect got into the driver's seat and fled the area.

19.    Review of bank surveillance video revealed that approximately two minutes prior to the suspect entering the bank, a black colored Chevrolet sedan, similar in style to a Malibu, drove past the entrance doors to the bank. Based on your Affiant's training and experience, your Affiant knows that while Chevrolet sedan models Cruze, Malibu, and Impala vary in size, their general body style and appearance are relatively similar. Photograph F is a still image showing that black Chevrolet sedan.



Photograph F

20.    The suspect was described by witnesses, and a suspect fitting the description was observed on the bank's surveillance video at the time of the robbery. The suspect was described as a Hispanic male; approximately 5'8" tall; medium build; brown eyes; wearing a black hooded sweatshirt with black and grey camouflage California bear on the front; a dark blue baseball hat with a New York Yankees logo on the front; a black face mask; blue pants; black shoe; and armed with a grey and black handgun. The suspect appears to be wearing the same clothing worn in bank robbery #3 on July 8, 2021. Photograph G is a still photograph taken from the bank's surveillance video.



Photograph G

21.     Bank Robbery #5:  On November 5, 2021, at approximately 1215 hours, an
unidentified Hispanic male suspect robbed the Chase Bank, a federally insured institution,
located at 2020 East McKellips Road, Mesa, Arizona.  The suspect entered the bank and
approached the teller counter.  The teller had just finished another transaction and still had
money on the counter from her previous transaction.  The suspect approached the teller and
stated, "I'll take that," while pointing to the currency on the counter.  The teller paused for
a moment.  The suspect then produced a semi-automatic handgun and raised it to his chest
level.

22.     The suspect then demanded the money in the teller's drawer.  The teller
complied and provided the suspect with approximately $2,000.00 in U.S. currency.  The
suspect also took the currency that was on the counter from the previous transaction, for a
total cash loss of approximately $2,182.00.  The suspect placed the currency in the front
pocket of his hooded sweatshirt and exited the bank.  No vehicle was observed in this
robbery.

23.     The suspect was described by witnesses, and a suspect fitting the description
was observed on the bank's surveillance video at the time of the robbery. The suspect was
described as a Hispanic male; 25 to 35 years of age; approximately 5'07" to 5'09" tall; 185

to 200 lbs.; brown eyes; shaved/short hair; and wearing a black hooded sweatshirt; black athletic shoes; black pants; black surgical mask; black New York Yankees ball cap; and armed with a silver semi-automatic handgun. Photographs H and I are still photographs taken from the bank's surveillance video.



Photograph H                    Photograph I

24.   Bank Robbery #6:  On December 4, 2021, at approximately 0920 hours, an unidentified Hispanic male suspect robbed the Chase Bank, a federally insured institution, located at 10746 East Baseline Road, Mesa, Arizona.  The suspect entered the bank and waited in the customer queue line for approximately 15 minutes before reaching the teller window.  When the suspect entered the bank, he had a cellphone device in his hand and appeared to be on a call for approximately five minutes.  The suspect then continued to manipulate and use his cellphone while waiting in line until he reached the teller counter.

25.   When the suspect approached the teller window, the suspect told the teller, "Give me all of your money."  The suspect then displayed a black and silver handgun on the counter under the plexiglass and pointed it towards her.  The teller realized it was a robbery and complied, giving the suspect some money, except the hundred-dollar bills. The suspect took the money and then told the victim teller to give him all the hundred-dollar bills also.  The teller grabbed a stack of one-hundred-dollar bills and gave it to the

suspect. The suspect took the money and his gun and walked out of the bank. This robbery resulted in an approximate cash loss of $9,532.00 in U.S. currency.

26.     The suspect was described by witnesses, and a suspect fitting the description was observed on the bank's surveillance video at the time of the robbery. The suspect was described as a Hispanic male; 5'10" tall; 250 lbs.; in his early thirties; wearing a black zip up hoodie; black hat with a white Denver Broncos logo on the front; dark jeans; and armed with a silver and black handgun. Photographs J and K are still photographs taken from the bank's surveillance video.




Photograph J          Photograph K

27.     Bank Robbery #7: On January 3, 2022, at approximately 1025 hours, an unidentified Hispanic male suspect robbed the Chase Bank located at 1140 West Avenue K, Lancaster, California. The suspect entered the bank and waited in the customer queue line. The suspect was observed holding a cellphone to his ear for approximately five minutes while he waited. Upon reaching the teller counter, the suspect commanded the teller to provide him with the money inside the teller's drawer. The suspect advised that he had a gun on him, to not make any movements, and to not do anything stupid. The victim teller complied and provided money to the suspect. The suspect demanded more money, so the victim teller proceeded to provide additional money. The total loss was

approximately $6,260 in U.S. currency. The suspect took the cash and fled the bank. The suspect did not present a note, and all interactions were verbal. The victim teller did not observe a weapon although the suspect had his hands in his hoodie pocket during the interaction.

28.     The suspect was described by witnesses, and a suspect fitting the description was observed on the bank's surveillance video at the time of the robbery. The suspect was described as a Hispanic male; approximately 5'8" tall; 250 lbs.; wearing a black hoodie, black baseball cap with a black letter D on the front of the cap possibly in cursive; a black mask covering their nose and mouth; light blue jeans; and black sneakers. Photographs L and M are still photographs taken from the bank's surveillance video.

     

Photograph L          Photograph M

29.     Los Angeles County Sheriff's Department (LASD) investigators were able to later review available surveillance video and identified what they believed to be the getaway vehicle used by the suspect. The vehicle was a white in color Dodge Dart with tinted windows, a black rear spoiler, and side graphics. No license plate was observed on the vehicle. The vehicle body style appeared similar to the 2013 to 2016 model years.

30.    Bank Robbery #8: On January 10, 2022, at approximately 0955 hours, an unidentified male suspect robbed the Chase Bank, a federally insured institution, located at 340 Eubank Boulevard NE, Albuquerque, New Mexico. The suspect entered the bank holding a cellphone device in his hands. The suspect approached the teller counter and made a verbal demand for money to the first victim teller while displaying a handgun. The victim teller realized it was a robbery and complied, providing the suspect with cash. The suspect moved over to a second victim teller while displaying the handgun and pointed at the cash drawer. The second victim teller complied with the demand and gave the suspect cash. The suspect took the cash and fled the bank in a white SUV style vehicle, possibly a 2000 to 2006 model year Chevrolet Suburban with unknown license plates. The approximate cash loss was $6,917.00 for this robbery.

31.    The suspect was described by witnesses, and a suspect fitting the description was observed on the bank's surveillance video at the time of the robbery. The suspect was described as a Hispanic male in his forties; heavy set; about 5'08" to 5'09" tall; wearing a black baseball hat with the letter "D" written on the front, possibly the LA Dodgers logo; a black colored face mask; brown hoodie; dark colored jeans; work boots; and armed with a handgun. Review of bank surveillance video revealed the suspect had what appeared to be a tattoo on the right side of his neck. Photographs N, O and P are still photographs taken from the bank's surveillance video.

  

Photograph N        Photograph O        Photograph P

32.    Based on my training and experience, your Affiant knows that individuals rely heavily on their cellular telephones for their communications and activities in their day-to-day activities. Based on that knowledge and the fact that the suspect was seen holding a cellphone device inside the bank during the December 4, 2021, the January 3, 2022, and January 10, 2022 bank robberies, there is reasonable belief to conclude that the suspect uses a cellphone and that the suspect would have likely had this device with him during all the bank robberies.

**Investigation**

33.    The term "Transactional Wireless Communications Access Records" refers to a listing of the historical cellular telephone numbers, assigned to a handset or device, that utilized a particular cell tower for a given period of time. Historical cell tower usage by a specific phone number is recorded, however, no content of the communication is retained. These records have also been referred to as "Cell Tower Dumps."

34.    Investigators identified the above-described probable dates, timeframes, and general locations that the above-described suspect is believed to have been present. Your

Affiant and investigators believe that by comparing the wireless transactional access records (i.e. historical cell tower data but not the content of any communications), it is possible to identify one or more mobile communication devices common to two or more of the relevant locations and/or dates/times identified herein; and that such mobile communications device(s) will be the yet-unidentified mobile communications device(s) used by the suspect(s) in furtherance of the foregoing criminal activity, or by witnesses likely to possess valuable information.

35.    On January 20, 2022, this Court issued a search warrant (22-8010MB) which authorized law enforcement to obtain from cellular communications service providers the transactional wireless communications access records, or "cell tower dumps" related to the cellular towers that serviced the above-described dates, times, and locations for the above referenced bank robberies and suspicious activity. The timeframes requested encompassed each robbery, respectively.

36.    Investigators reviewed the transactional wireless communications access records obtained from AT&T. According to the transactional wireless communications access records, telephone number **(480) 544-9901 (Target Cellphone-1)** was found present in records corresponding to seven of the bank robbery locations described above. Specifically:

a.    Bank Robbery #1 on June 28, 2021, at 5625 FM 1960 Road West, Houston, Texas;

b.    Bank Robbery #2 on July 1, 2021, at 200 Lomas Blvd NW, Albuquerque, New Mexico;

c.    Bank Robbery #3 on July 8, 2021, at 5305 South Superstition Mountain Drive, Gold Canyon, Arizona;

d.    Bank Robbery #4 on July 29, 2021, at 5305 South Superstition Mountain Drive, Gold Canyon, Arizona;

e.    Bank Robbery #5 on November 5, 2021, at 2020 East McKellips Road, Mesa, Arizona;

f.    Bank Robbery #6 on December 4, 2021, at 10746 East Baseline Road, Mesa, Arizona; and

g.    Bank Robbery #7 on January 3, 2022, at 1140 W Avenue K, Lancaster, California.

37.    Based on these transactional records, and your Affiant's training and experience, the user of telephone number **Target Cellphone-1** was in the service area of the cell towers that cover the vicinity of the respective banks around the time of each of the referenced seven bank robberies.  It is noted that the referenced seven bank robberies occurred over a span of approximately seven months and in four different States.  Based on my training and experience, and the fact that each of the referenced seven bank robberies is separated by both time and distance, your Affiant finds it reasonable to believe that the user of telephone number **Target Cellphone-1** was in the area of each of these bank robberies during a timeframe which encompassed the respective robberies.

38.    Investigators noticed that within the transactional records related to Bank Robbery #1, while telephone number **Target Cellphone-1** was present and using the cell towers serving the bank, it had SMS/text message communication with **(602) 341-2240**.

### Identification of Fernando Enriquez

39.    A search of commercially available databases that aggregate records held by various third parties and public information revealed **Target Cellphone-1** was associated with a Mr. Fernando Enriquez ("ENRIQUEZ"). ENRIQUEZ had an associated address of

9819 East La Palma Avenue, Apt 3, Gold Canyon, Arizona. ENRIQUEZ also had address history in the Albuquerque, New Mexico area. The databases also identified email address **enriquezfernando@yahoo.com** as being associated with ENRIQUEZ.

40.     A search of public information databases revealed **(602) 341-2240** was associated with a Ms. Crystal Marie Quispe ("Quispe"), who was also associated with an address of 9819 East La Palma Avenue, Gold Canyon, Arizona. Quispe also had address history in the Lancaster, California area. The database also identified email address **diazcrystal1988@gmail.com** as being associated with Quispe.

41.     Investigators identified a New Mexico state driver's license, issued in December 2013, for a Fernando ENRIQUEZ, date of birth XX/XX/1986. The driver's license number ended in 614 and expired on or about December 18, 2021. Database checks did not reveal a current driver's license for ENRIQUEZ in New Mexico, Arizona, California, or Texas. From review of the New Mexico driver's license information pertaining to ENRIQUEZ's physical description and photo, your Affiant, based on my training and experience, believes that ENRIQUEZ's physical appearance, to include height, weight, and facial features, are similar to those described by witnesses and depicted in surveillance images of the above referenced bank robbery suspect. Photograph Q is from ENRIQUEZ's New Mexico driver's license.



Photograph Q

42.    Investigators conducted checks of a database containing automobile insurance claim information.  This identified a result for a Fernando ENRIQUEZ; year of birth 1986; address 9819 East La Palma Avenue, Apt 3, Gold Canyon, Arizona; a New Mexico driver's license ending in 614; and telephone number **Target Cellphone-1**.  The information indicated that ENRIQUEZ was an involved party for an automobile claim with a listed date of loss as December 6, 2021 in Los Angeles, California.   The vehicle associated with ENRIQUEZ was listed as a 2019 Ford Econoline E350 with Indiana license plate 2862591.  A check of motor vehicle registration revealed that Indiana license plate 2862591 was registered to Penske Truck Leasing Co.

43.    Investigators contacted Penske Truck Leasing and learned that on December 6, 2021, ENRIQUEZ was the listed renter of a 2019 Ford Econoline E350 with Indiana license plate 2862591.  It was a one-way rental with a pick-up location in Queen Creek, Arizona on December 4, 2021 and drop-off location listed in Sun Valley, California on December 7, 2021. ENRIQUEZ's contact information was listed as: telephone number **Target Cellphone-1**; email address **enriquezf3000@gmail.com**; address: 9819 E. La Palma Ave., Apt 3, Gold Canyon, Arizona; driver's license ending in 614. Based on the fact that email address **enriquezf3000@gmail.com** was listed for ENRIQUEZ's rental of the truck, your Affiant finds it reasonable to believe that ENRIQUEZ uses email address **enriquezf3000@gmail.com.**

44.    Investigation revealed that on July 30, 2021, ENRIQUEZ was issued a traffic violation for speeding in Arizona.  ENRIQUEZ was driving a vehicle bearing Arizona license plate 21A6BCA.

45.    Research into Arizona license plate 21A6BCA revealed that from on or about June 16, 2021 through December 29, 2021, Arizona license plate 21A6BCA was assigned to a black 2016 Chevrolet Malibu sedan, vehicle identification number (V.I.N.) ending in

13009, with a listed registered owner of Crystal Quispe at 9819 East La Palma Avenue, Apt 4, Gold Canyon, Arizona.  Records indicated that on or about December 29, 2021, the vehicle transferred ownership to another party, which based on your Affiant's training and experience, indicates the vehicle was likely sold.

46.    It is noted that ENRIQUEZ was issued the traffic violation in Arizona the day after Bank Robbery #4 occurred in Arizona.  It is also noted that the timeframe of registered ownership by Crystal Quispe of the black Chevrolet Malibu assigned Arizona license plate 21A6BCA is consistent with the timeframe of the above referenced bank robberies during which a black Chevrolet sedan style vehicle was described by witnesses, in particular: Bank Robbery #2 on July 1, 2021 in Albuquerque, New Mexico; and Bank Robbery #4 on July 29, 2021 in Gold Canyon, Arizona.

47.    Checks of Arizona Motor Vehicle Division records identified a driver's license for Crystal Quispe, date of birth XX/XX/1988, address 9819 East La Palma Avenue, Apartment 4, Gold Canyon, Arizona. An alias name of Crystal Marie Diaz was listed for Quispe.

48.    Investigators conducted checks of databases containing License Plate Reader (LPR) information. The LPR checks revealed that on June 24, 2021, license plate 21A6BCA was captured travelling eastbound on Interstate 40 between the Arizona-New Mexico border and Gallup, New Mexico.  This travel is in the direction of Albuquerque, New Mexico from Arizona.  It is noted that this license plate capture was four days before Bank Robbery #1, which occurred on June 28, 2021, in Houston, Texas, and one week before Bank Robbery #2, which occurred on July 1, 2021, in Albuquerque, New Mexico.

49.    Checks of transactions at pawn shops revealed a pawn ticket in Arizona dated December 8, 2020 in which Quispe listed address 9819 East La Palma Avenue, Apt 4, Gold Canyon, Arizona, and **(602) 341-2240** as her contact information.

**Continued Investigation**

*Review of AT&T records*

50.     On February 15, 2022, this Court issued a search warrant (22-8035MB) which authorized law enforcement to obtain subscriber information and call detail records with cell site activity information from AT&T for telephone numbers **Target Cellphone-1** and **(602) 341-2240**.

51.     Review of records for **Target Cellphone-1** revealed Fernando ENRIQUEZ was the listed subscriber, since on or about March 1, 2021. International mobile equipment identifier (IMEI) **351721113883348** was associated with **Target Cellphone-1**. A check of IMEI **351721113883348** revealed it was a Samsung model Galaxy A01 device, which is an Android operating system cell phone device.

52.     Review of records for **(602) 341-2240** revealed the listed subscriber was Crystal Quispe, from on or about October 9, 2020 to October 9, 2021, when the prepaid account was cancelled. IMEI **355565110623710** was associated with (602)341-2240. A check of **355565110623710** revealed it was a Motorola model Moto G Play device, an Android operating system cell phone device.

53.     Based on your Affiant's training and experience, your Affiant knows the Android device operating system is a mobile operating system developed by Google. In order for an Android device to interface with the Google Play Services it requires the user to provide an email address or Google account. Based on this fact, your Affiant finds it reasonable to believe that ENRIQUEZ and Quispe have Google accounts.

54.     As noted above, the subscriber information for **(602) 341-2240** indicated the account was canceled by Quispe on or before October 9, 2021. During review of the call detail records, investigators noted that starting on or around September 9, 2021, **(602) 341-2240** stopped appearing in the records for **Target Cellphone-1**, indicating there was no

longer contact between the two numbers. Starting on or about September 11, 2021, phone number **(480) 432-6094 (Target Cellphone-2)** began to appear in the call detail records of ENRIQUEZ's phone. It is further noted that on December 4, 2021, around the time that Bank Robbery #6 occurred, ENRIQUEZ had phone contact with **Target Cellphone-2**.

55.     The AT&T records included payment history for the accounts. Debit and/or credit cards ending in 10-9222, 95-2629, and 82-8870 were among those used to pay ENRIQUIEZ's **Target Cellphone-1** account. It was noted the cards ending in 95-2629 and 82-8870 were also among those used to pay for Quispe's **(602) 341-2240** account. Investigation determined the card ending in 82-8870 was associated with a Chase Bank account. The cards ending in 10-9222 and 95-2629 were associated with Green Dot Corporation accounts.

56.     Records were obtained from Chase Bank for accounts associated with card ending in 82-8870 and/or Fernando ENRIQUEZ. The records revealed the card was a debit card connected to a checking account in the name of Crystal Marie Diaz, telephone number (602)-341-2240, email address **diazcrystal1988@gmail.com**, and the above referenced 9819 East La Palma Avenue address. The social security number and driver's license number listed resolved to Crystal Quispe. Since email address **diazcrystal1988@gmail.com** was listed on the account for Quispe, your Affiant finds it reasonable to believe that Quispe uses this email account.

57.     Records were obtained from Green Dot Corporation for accounts associated with card ending in 10-9222 and/or ENRIQUEZ. The card ending in 10-9222 was a Walmart Moneycard activated on or about September 23, 2021 when $20 was loaded to the card. The card had the following customer information: Crystal Quispe, her known social security number and DOB, the La Palma Ave address, telephone number **Target Cellphone-2**, and email address **diazcrystal1988@gmail.com**.

58.     Since **Target Cellphone-2**, is listed on a financial account in the name of Quispe, your Affiant finds it reasonable to believe that Quispe uses **Target Cellphone-2**. Based on this fact, and the fact that **Target Cellphone-2** showed up in the call records for ENRIQUEZ's phone starting on or about September 11, 2021, to include contact on December 4, 2021 around the time of that Bank Robbery #6 occurred, call detail records with cell site activity are being requested for **Target Cellphone-2** from September 1, 2021 to present.

59.     The Green Dot records also listed ENRIQUEZ as the customer for a Walmart MoneyCard ending in 80-9528, which was activated on or about December 10, 2021.  The customer information listed the name of Fernando ENRIQUEZ, his known social security number and DOB, the La Palma Ave address in, Gold Canyon, AZ, telephone number **Target Cellphone-1**, and email address **diazcrystal1988@gmail.com**. This account listed several transactions with Google, which is indicative of the user making a purchase through the Google Play Store, which requires a Google account.  Based on the fact that email address **diazcrystal1988@gmail.com** was listed on a financial account in the name of ENRIQUEZ, your Affiant finds it reasonable to believe that ENRIQUEZ uses and/or has access to the **diazcrystal1988@gmail.com** Google account.

### *Identification of Social Media Accounts*

60.     Through searches of commercially available databases that aggregate records held by various third parties, databases of public information, and the internet investigators identified various social media accounts associated with ENRIQUEZ and Quispe.

61.     Investigators identified an Instagram account under username "**enriquezf3000**".   The profile was viewed on March 16, 2022, at URL Instagram.com/enriquezf3000/ and listed a profile name of "Fernando."  Several photos were viewable on this Instagram page.  Comparison of ENRIQUEZ's driver's license photo to photos on the **enriquezf3000** Instagram profile revealed similar appearance and physical

characteristics to ENRIQUEZ. Several of the photos depicted ENRIQUEZ with a female matching the physical appearance and characteristics of Quispe. Several of the photos and videos posted to this Instagram account appeared to be re-posts from a TikTok social media account identified as "**@elmexicano005**." Based on this information, investigators find it reasonable to believe that Fernando ENRIQUEZ is the user of Instagram profile **enriquezf3000**.

62. Investigators located the TikTok account "**@elmexicano005**," which was viewed on March 16, 2022, at URL tiktok.com/@elmexicano005. Several photos and videos were viewable on this TikTok account. Comparison of ENRIQUEZ's driver's license photo to photos on the "**@elmexicano005**" TikTok account revealed similar appearance and physical characteristics to ENRIQUEZ. There were photos and videos in common between the Instagram profile for "**enriquezf3000**" and this TikTok account. This included photos of ENRIQUEZ with the female matching the physical appearance and characteristics of Quispe. Several posts tagged, or referenced, the TikTok account "**@diazcrystal88**". Based on this information, investigators find it reasonable to believe that Fernando ENRIQUEZ is the user of the TikTok account "**@elmexicano005**".

63. Review of the publicly viewable portion of the TikTok account "**@elmexicano005**", identified a video posted on or about March 13, 2022, depicting ENRIQUEZ standing in front of a white Chevrolet Suburban SUV vehicle. Investigators noted the vehicle behind ENRIQUEZ was similar in style and appearance to the white Chevrolet Suburban used as the getaway vehicle observed in Bank Robbery #8 on January 10, 2022, in Albuquerque, New Mexico. For comparison reference, Photograph R is the suspect vehicle observed in Bank Robbery #8, while Photograph S is a screenshot from the video found on the TikTok account.

 

Photograph R                                    Photograph S

64.    Additionally, investigators noted that several photos posted, on or about June 15, 2021, to both ENRIQUEZ's Instagram profile and his TikTok account, showed a tattoo visible on the right side of ENRIQUEZ's neck.  The tattoo appeared to be the name "Crystal" written in cursive, with a crown above the "C" and red lips below the name.  As noted above, review of bank surveillance video from Bank Robbery #3 revealed the suspect had a dark mark or tattoo on the right side of his neck.  Review of surveillance video from Bank Robbery #8 also revealed the suspect had what appeared to be a tattoo on the right side of his neck and behind his ear.  Although not entirely legible in the bank video, the shape of the tattoo and dark mark is similar to that depicted in the photo of ENRIQUEZ found on the Instagram and TikTok accounts.  For comparison reference, Photographs T is a screenshot image depicting the tattoo found on the Instagram profile.  Photograph U is a still image from bank surveillance video from Bank Robbery #3, which depicts the dark mark visible on the neck.  Photograph V is a still image from the bank surveillance video from Bank Robbery #8, which depicts what appears to be the tattoo on the suspect's neck.





Photograph T          Photograph U          Photograph V

65.     Investigators located the TikTok account "**@diazcrystal88**", which was viewed on March 16, 2022, at URL tiktok.com/@diazcrystal88. Several photos and videos were viewable on this TikTok account. Comparison of Quispe's driver's license photo to photos on the "**@diazcrystal88**" TikTok account revealed similar appearance and physical characteristics to Quispe. There were photos and videos in common between the TikTok account @elmexicano005 and this TikTok account. Based on this information investigators find it reasonable to believe that Crystal Quispe is the user of the TikTok account "**@diazcrystal88**".

66.     Review of the publicly viewable portion of the TikTok account "**@diazcrystal88**", identified a video posted on or about May 16, 2021, depicting a black Chevrolet Malibu parked in the driveway of a residence. Investigators noted the residence resembled the property located at the La Palma Avenue address in Gold Canyon, Arizona. The caption for the posted video was "got me a new baby Chevy Malibu out with the old in with the new." Investigators noted that the vehicle shown in the posted video resembled black Chevrolet sedan seen in bank surveillance video drive past the bank entrance prior to Bank Robbery #4.

67.     Investigators identified a Facebook profile under profile name "Crystal Quispe" at URL facebook.com/crystal.diaz.77128 and User ID **100001838959818**.

Several photos were viewable on this Facebook page. Comparison of the photos to the Quispe's driver's license photo revealed similar appearance and physical characteristics to Quispe. The profile also listed that Quispe lived in Gold Canyon, Arizona. There were also photos with Quispe and a male who resembled ENRIQUEZ. Based on these facts, your Affiant finds it reasonable to believe that Quispe is the user of Facebook profile "Crystal Quispe" at URL facebook.com/crystal.diaz.77128 and User ID **100001838959818**.

### Additional Bank Robberies

68.     On March 29, 2022, FBI investigators in Arizona became aware of two additional bank robberies which investigators believe to be linked to this robbery series, based on the suspect's physical description, the modus operandi (M.O.) used during the robberies, and other investigative information.

69.     <u>Bank Robbery #9:</u> On March 24, 2022, at approximately 0900 hours, an unidentified Hispanic male suspect robbed the Citizens Bank, a federally insured institution, located at 625 US Highway 98, Columbia, Mississippi. The suspect entered the bank and displayed a silver and black handgun at the victim and demanded money. The victim teller complied and provided approximately $3,500 to the suspect. The suspect fled the bank in an older, white colored Chevrolet Suburban or Tahoe style SUV. Columbia Police investigators were able to obtain surveillance video from nearby businesses and were able to track the getaway vehicle as traveling west on US Highway 98 away from Columbia, Mississippi toward Tylertown, Mississippi.

70.     The suspect was described as a Hispanic male wearing a maroon or brown colored hooded sweatshirt, black baseball style hat with the Denver Broncos logo on the front, and blue jeans. Photograph W is a still image taken from surveillance video of the suspect. Photograph X is a still image of the getaway vehicle taken from a surveillance camera.





Photograph W                    Photograph X

71.     Upon obtaining this information, your Affiant noted that the suspect matched the physical description as the suspect in this bank robbery series. Additionally, the suspect was wearing a hat similar to that worn during Bank Robbery #6 and a sweatshirt similar to that worn in Bank Robbery #8. Also of note was the white Chevrolet Suburban used as a getaway vehicle was similar in appearance to the vehicle observed in Bank Robbery #8.

72.     Bank Robbery #10: On March 29, 2022, at approximately 0930 hours, a Hispanic male suspect robbed the Chase Bank, a federally insured institution, located at 3250 Rebecca Lane, Abilene, Texas. The suspect entered the bank and approached the teller counter. The suspect displayed a handgun and demanded all the money in the drawer. The victim teller complied and provided approximately $5,628 in cash. The suspect took the money and fled the bank in a white Suburban SUV style vehicle. A witness was able to obtain the license plate number, WHB3030, and provide it to responding law enforcement.

73.     Responding law enforcement was able to determine the licenses plate was from Mississippi and disseminated the suspect vehicle information to local and area law enforcement agencies. Texas Department of Public Safety (DPS) Troopers subsequently located a vehicle matching the description traveling westbound on Interstate-20 near

Merkel, Texas and stopped the suspect vehicle. Fernando ENRIQUEZ was driving the vehicle. Crystal Quispe and two minor children, were passengers.

74.    ENRIQUEZ was taken into custody at approximately 1007 hours and transported to the Abilene Police Department, where he was interviewed by investigators. Prior to the interview ENRIQUEZ was advised of his *Miranda* rights. During the interview ENRIQUEZ denied involvement in the bank robbery.

75.    Quispe was also transported to the Abilene Police Department where she was interviewed by investigators from the FBI. Prior to the interview Quispe was advised of her *Miranda* rights. During the interview, Quispe confirmed ENRIQUEZ's phone number as **Target Cellphone-1**. Quispe said that she and ENRIQUEZ had been living in Tylertown, Mississippi with the family of ENRIQUEZ. Quispe claimed to not have knowledge of the bank robberies. Regarding the events of March 29, 2022, prior to being stopped by police, Quispe said they were staying at a motel in town. That morning ENRIQUEZ told her he would go fill the vehicle with gasoline and then left. He later returned to the motel and was rushed to get the vehicle loaded. They then departed.

76.    During the interview, investigators showed Quispe the surveillance still image in which the suspect was wearing a hooded sweatshirt with a large bear on. Quispe identified the suspect in the photos as ENRIQUEZ. It is noted that the suspect wore the same clothing, the sweatshirt with a large bear on it, in Bank Robbery #3 and #4, which occurred in Gold Canyon, Arizona

77.    Quispe was also shown the still surveillance image from Bank Robbery #8, in which the suspect was wearing a brown hooded sweatshirt. Quispe also identified that suspect as ENRIQUEZ.

78.    Quispe told investigators that she did not own a handgun and was not aware if ENRIQUEZ owned any guns.

79.    Regarding vehicles used by ENRIQUEZ, Quispe commented that ENRIQUEZ had previously driven a Dodge Dart vehicle for approximately two months.

## Search of the white Chevrolet Suburban

80.    The vehicle ENRIQUEZ and Quispe were stopped in was a white model year 2000 Chevrolet Suburban bearing Mississippi license plate WHB3030. The vehicle was registered to Crystal Diaz at an address in Tylertown, Mississippi, as of March 2022. Database checks of the vehicle identification number assigned to that vehicle revealed that it was previously registered to an individual in Palmdale, California. The information indicated that on or about January 3, 2022, the vehicle was sold to Crystal Diaz. Investigators noted that January 3, 2022, was the date Bank Robbery #7 occurred in Lancaster, California, which is near Palmdale.

81.    Quispe provided investigators with consent to search her vehicle, the white Suburban bearing Mississippi license plate WHB3030. During the search of the vehicle investigators located and seized as evidence several items, to include:

- $5,658 in U.S. currency
- Multiple baseball style hats
- Gray sweatshirt
- Brown hooded sweatshirt
- A Hi-Point Model C 9mm handgun, with serial number 308863. The handgun had a gray-colored slide with a black handle. The handgun matched the appearance and description of the handgun seen in surveillance images of the above-described bank robberies

82.    Based on the fact that Bank Robberies #9 and #10 are believed to be part of this bank robbery series based on suspect description and M.O.; the fact that investigators had previously obtained via search warrant call detail records with cell site activity

information for (480) 544-9901, up to February 15, 2022; the fact that Bank Robberies #9 and #10 occurred after those records were obtained, the fact that ENRIQUEZ was identified as the suspect of Bank Robbery #10, call detail records with cell site activity are being requested for (480) 544-9901 from February 15, 2022 to present.

83.     On March 30, 2021, ENRIQUEZ was charged via a criminal complaint in the Northern District of Texas for one count of 18 U.S.C. Section 2113 (a) and (d) as it related to Bank Robbery #10.

84.     Based on my training and experience, and in consultation with other experienced investigators, your Affiant is aware that individuals involved in criminal activity, to include robberies, often maintain at their residences, vehicles, and on their property, tools and other implements they used during or in furtherance of the commission of the crime. Individuals involved in robberies will also maintain notes or other documents containing the names and contacts of their associates. These individuals will also maintain notes or other documents related to the planning, preparation and execution of the crime or related to the victim. Sometimes robbers take pictures or videos of themselves, their fellow conspirators, clothing or instruments used in the commission of crimes, as well as money or property obtained during the course of the robberies and post those pictures or videos on social media websites, such as **Facebook, Instagram, TikTok**, or store them in cloud-based accounts, such as **Google** accounts, **Yahoo** accounts, or Apple iCloud accounts, or share them via cell phone applications and messaging services. I also know that criminals, to include robbers, will use various means of communication, to include telephonic and/or other electronic means, to communicate with fellow conspirators and share information, including the use of messenger service applications on their cell phones, messenger services included with **Facebook, Instagram, TikTok, Google, Gmail**, Apple, **Yahoo**, and other social media accounts. I also know that criminals, to include robbers, will utilize the internet to conduct research on the target locations. These communications may take

place at various stages of the commission of the crime, i.e, the planning of, execution of, or after the crime.

85. Based on my training and experience, these messenger services applications often keep on the cell phone a copy of messages and communications sent or received. These messenger services also often keep on their servers a copy of messages and communications sent or received or posted on profiles.

86. Based on these facts, records are being requested for the identified email, social media, messaging, and cloud storage accounts identified and referenced above, for the time period of June 1, 2021 through the present.

87. On March 2, 2022, a preservation request was submitted to Yahoo Inc. for account **enriquezfernando@yahoo.com**.

88. On March 16, 2022, a preservation request was submitted to TikTok for accounts **elmexicano005, diazcrystal88**, and **diazcrystal1988@gmail.com**.

89. On March 2, 2022, a preservation request was submitted to Facebook for User ID **100001838959818**. On March 16, 2022, a preservation request was submitted to Instagram for the **enriquezf3000** account.

90. On March 2, 2022, a preservation request was submitted to Google for account identifiers: **diazcrystal1988@gmail.com, enriquezfernando@yahoo.com**, and IMEI **351721113883348**. On March 15, 2022, a preservation request was submitted to Google for account identifiers: **enriquezf3000@gmail.com** and (480)544-9901.

91. The times and dates for each bank robbery discussed above are expressed in local time for each incident. Based on my training and experience, I know that cellular service providers use Coordinated Universal Time, otherwise known as UTC, as a standard

reference time.  Therefore, when necessary, I have converted these times and dates into UTC to provide to the Service Providers.

## Cell Phone Providers

92.     Based on my training and experience, individuals rely heavily on the cellular telephones and their communications in their day-to-day activities and actions.  These communications, in the form of telephone calls, voice messages, SMS text messages, and other like communications, cause their cellular telephone to emit and receive electronic signals to and from cellular telephone company cell towers.  With the assistance of court-authorized technological tracing devices and services, these electronic signals indicate the geographic location of the individual in possession of the specific cellular telephone emanating and receiving said electronic signals.  By tracking the cellular telephone electronic signals between a cellular telephone and the cell towers it relies on and communicates with, or in other words the wireless transactional access records, an individual's location can be determined, finitely identified and tracked through surveillance.  This court-authorized surveillance technique is routinely successful in locating an individual relevant and material to an on-going criminal investigation, when that individual is attempting to avoid law-enforcement contact, whether they be a victim, witness, suspect, or an unwitting involved party.  In today's society, virtually everyone owns a wireless telephone.

93.     Through training and experience your Affiant knows that acquiring an extended period of call detail records can assist in establishing a pattern of life, or use, of a target telephone.  That is, up to 6 months of records prior to the criminal activity can assist investigators in establishing calling patterns of the target telephone and prevalent cell sectors utilized by the target telephone.  The establishment of this pattern of life, or use, is critical in helping investigators determine if, and when, this calling pattern changes, intensifies, or wanes during relevant time periods within the investigation.  Through

training and experience, the Affiant knows that changes within this pattern occur with respect to calls to and from the victim(s) and or suspects in, and around, the time of criminal activity. These changes in the pattern of life can also assist investigators in identifying any co-conspirator(s) who may have provided aid or counsel, during the relevant time period surrounding the conception, planning, commission and/or cover-up of criminal activity.

94.     Based on the foregoing facts and your Affiant's training and experience, your Affiant has probable cause and reasonable belief that the information obtained from the subscriber information, call detail records with cell site location activity, and historical billing records for **Target Cellphone-1** and **Target Cellphone-2** will provide evidence to include, or exclude, the users of **Target Cellphone-1** and **Target Cellphone-2** as being involved in the bank robberies committed between on or about June 28, 2021 and March 29, 2022 in the District of Arizona and elsewhere. Probable cause exists that the disclosure of cell site activity and cell site locations is material to this criminal investigation. The subscriber information, call detail records with cell site activity and cell site locations, and historical billing records, are being requested from February 15, 2022 to present for **Target Cellphone-1**, and from September 1, 2021 to present for **Target Cellphone-2**. This timeframe encompasses the above-referenced bank robberies and will also provide records to assist in establishing calling patterns.

95.     In my training and experience, I have learned that the cellphone Service Provider is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas,

and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

96.     Based on my training and experience, I know that the Service Provider can collect cell-site data about the Target Cellphone. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

97.     Based on my training and experience, I know that the Service Providers also collect per call measurement data, which each Service Provider may refer to by different names, i.e. NELOS, Real Time Tool (RTT), Per Call Measurement Data (PCMD), TrueCall records, timing advance information, or round trip delay information. This type of data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

98.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional

records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Telephone's user or users and may assist in the identification of co-conspirators and/or victims.

## Remote Computing Service and Electronic Communication Service Providers

### Facebook and Instagram

99.    Meta Platforms Inc. is a technology company and parent organization of Facebook, Instagram, and other social technology platforms. Meta Platforms Inc, based in Menlo Park, California, accepts legal process on behalf of Facebook and Instagram.

100.    Facebook is owned by Meta Platforms Inc and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

101.    Instagram is a social networking service owned by Meta Platforms Inc. and can be accessed at http://www.instagram.com. In the same manner as Facebook, Instagram allows its users to establish accounts with Instagram, and users can then use their accounts to share written news, photographs, videos, and other information with other Instagram users, and sometimes with the general public.

102.    The Instagram social-networking platform is similar to Facebook, as such the Facebook background information below is similar to the Instagram service.

103.   Facebook and Instagram ask users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

104.   Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

105.   Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

106.   Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their

whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

107.   Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

108.   Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

109.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

110.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

111.   Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

112.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

113.   Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

114.   In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

115.   Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

116.   Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

117.   As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data

associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

118. Therefore, the computers and servers of Facebook, and Instagram respectively, are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook and Instagram, such as account access information, transaction information, and other account information.

### Google

119.   In your Affiant's training and experience, I have learned that Google provides a variety of online services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts at the domain name Gmail.com, like the email accounts listed in Attachment A. Google also allows users to link email accounts from other providers to the Google account. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users and identify communication between associates and/or co-conspirators.

120.   A Google subscriber can also store files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures, videos and other files (separate from those attached to emails), on servers maintained and/or owned by Google. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

121.   In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying

subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

122.   In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

123.   In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

124.   As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.   Further, information maintained by the email provider can show how and when the account was accessed or used.   For example, email providers typically log the IP addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation.   This geographic and timeline information may tend to either inculpate or exculpate the account owner.   Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

125.   In my training and experience, Google collects and retains location data from mobile devices enabled with Google services. The company uses this information for location-based advertising and location-based search results. Per Google, this information

is derived from Global Position System (GPS) data, cell site/cell tower information, and Wi-Fi access points. While the specific parameters of when this data is collected are not entirely clear, it appears that Google collects this data whenever one of their services is activated and/or whenever there is an event on the mobile device such as a phone call, text messages, internet access, or email access. I believe this data will show the movements of the suspect's mobile device and assist investigators with establishing patterns of movement, identifying residences, work locations, and other areas that may contain further evidence relevant to the ongoing criminal investigation.

126.    Google also provides other services and platforms, such as YouTube, which is a free video sharing platform, in which a user can create and upload their own videos.

## Yahoo

127.    In my training and experience, I have learned that Yahoo Inc. ("Yahoo") provides a variety of on-line services, including electronic mail ("email") access, to the public. Yahoo allows subscribers to obtain email accounts at the domain name Yahoo.com, like the email account listed in Attachment A. Subscribers obtain an account by registering with Yahoo. During the registration process, Yahoo asks subscribers to provide basic personal information. Therefore, the computers of Yahoo are likely to contain stored electronic communications (including retrieved and retrieved email for Yahoo subscribers) and information concerning subscribers and their use of Yahoo services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

128.    A Yahoo subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than

ones attached to emails), and other files, on servers maintained and/or owned by Yahoo. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

129.   In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

130.   In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

131.   In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

132.   This application seeks a warrant to search all responsive records and information under the control of Yahoo, a provider subject to the jurisdiction of this court, regardless of where Yahoo has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Yahoo's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

133.   As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how

and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## TikTok

134.   In your Affiant's training and experience, I have learned that TikTok is a social networking application ("app") through which users typically create brief dance, lip-sync, comedy, or other videos to share.  The short videos are generally 15 seconds to three minutes in length. TikTok allows users to create and add a music feature in the background, which can be sped up, slowed down, or edited with a filter. The app allows uploading the videos to share with others on TikTok or other social medial platforms. The app's "react" feature allows users to film their reaction to a specific video.  Users can choose whether any other user, or only their "friends", may interact with them through videos, direct messages, and live chats. The app allows users to set their accounts as "private," so that only approved users can see the content that is created by that account. Users can also send their friends videos, emojis, and messages with direct messaging within the application.

135.   I have researched what data TikTok stores and is able to provide to law enforcement officers via their Law Enforcement Guide, available at the following web address: https://www.tiktok.com/legal/law-enforcement?lang=en. The Law Enforcement Guide listed TikTok Inc., located at 5800 Bristol Parkway, Suite 100, Culver City, California, as the TikTok entity to receive legal requests for data of users in the United States. Specifically, as described below, TikTok obtains and stores subscriber information, video content, user interactions, log data, among other information.

136.   TikTok offers users the ability to create an identity within the app referred to as a "username." This username is unique to the account. The username for a particular TikTok account holder is displayed in their TikTok profile.   According to the Law Enforcement Guide, the username is in the format "@xxxxxxxx".

137.   TikTok maintains subscriber information including data about its users. I know based on my training and experience that social network providers like TikTok typically ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's name, physical address, and other identifiers. I know based on my research of TikTok that it records and stores subscriber information, which often includes the username, email address, phone number, device model of the device that users access their account with, account creation date, and Internet Protocol ("IP") address.

138.   TikTok stores video content including videos and other multimedia created and modified by TikTok users. I know based on my training and experience that even if this content is removed, locked, or deleted, often social media companies retain the data on their information systems. I know based on my research of TikTok, that it appears to store data that has been made private, locked, or deleted by its users.

139.   TikTok maintains records of user interactions, or how TikTok users communicate with each other. I know based on my training and experience that social media platforms like TikTok often include internal messenger systems in which users can interact, send each other direct messages, and react to each other's content in different ways. Based on my research of TikTok, I know that the application allows users to interact with each other through commenting on videos, direct messages, and live chats. TikTok stores this data.

140.   TikTok maintains log data regarding its users' use of the app. I know from my training and experience that social media platforms often create detailed analytics of when their users log into the application, the dates and times of their content creation or internal messages, and other "metadata." I know from my research of TikTok that the application collects metadata of its users including login/logout records, dates and times of media creation and modification, dates and time in in-app communications, and other data. TikTok also collects data regarding the location of their users. I believe this data will show the movements of the suspect's mobile device and assist investigators with establishing patterns of movement, identifying residences, work locations, and other areas that may contain further evidence relevant to the ongoing criminal investigation.

141.   Additionally, based on my training and experience, I know that social network providers like TikTok typically maintain records of their users' communications with the provider. This often includes communications regarding issues relating to their account, such as technical problems or complaints. Providers typically retain records about such communications, including records of e-mails and other contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

142.   Information stored on computers and servers owned, maintained and/or used by TikTok Inc., including that described above, may provide crucial evidence of the "who,

what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to an account that is retained by a provider like TikTok can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up and other communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a TikTok account at a relevant time. Further, such stored electronic data can show how and when the account was accessed or used. Such "timeline" information allows investigators to understand the chronological context of the usage of an account, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the user of a TikTok account. Additionally, stored electronic data may provide relevant insight into the state of mind of the user of a TikTok account as it relates to the offense under investigation. For example, information relating to a particular TikTok account may indicate the user's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement.

## AUTHORIZATION REQUEST

143.   I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require the Providers to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

144.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on the Providers. Because the warrant will be served on the Providers, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## CONCLUSION

145.    Based on the foregoing, I have reason to believe there is probable cause to obtain the items referenced in Attachment B from the **Providers**, as those items are relevant and related to the ongoing investigation of a series of bank robberies, which is in violation of 18 U.S.C. § 2113(a) and (d) (Bank Robbery and Incidental Crimes) and 18 U.S.C. § 924(c) (Brandishing, Displaying, or Discharging a Firearm During a Crime of Violence).

146.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States" (including a magistrate judge of such a court) that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

147.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

//

//

//

148.   This affidavit was sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose

Respectfully submitted,

TRAVIS
BODILY

Digitally signed
by TRAVIS BODILY
Date: 2022.03.31
16:19:15 -07'00'

Travis K. Bodily
Special Agent
Federal Bureau of Investigation

Sworn to telephonically before me on April ___1___, 2022.

HONORABLE MICHAEL T. MORRISSEY
UNITED STATES MAGISTRATE JUDGE